SARAH VENEY et al., Respondents, v. HENRY H. FURTH et al., Appellants.

St. Louis Court of Appeals. Argued and Submitted November 14, 1912. Opinion Filed March 1, 1913.

1. APPELLATE PRACTICE: Equity Cases: Review. While it is the duty of an appellate court to weigh the testimony in an equity case and determine the matter on its own conclusions derived therefrom, irrespective of the findings of the trial court, nevertheless, in arriving at a determination, it will pay great deference to such findings.

2. FRAUD AND DECEIT: Constructive Fraud: Knowledge. Fraud is chargeable to persons who, having the means of acquiring knowledge concerning the transaction, shut their eyes to all the surrounding circumstances, and, claiming to be ignorant of the fraud, seek an advantage to themselves through it.

3. CANCELLATION OF INSTRUMENTS: Innocent Holder: Fraud and Deceit. Promissory notes secured by a deed of

trust were placed in the hands of a real estate agent, to be negotiated by him and the proceeds to be used in improving the mortgaged property. The agent pledged the notes and deed of trust to secure his own indebtedness, and the pledgee sold the collateral for nonpayment of the debt secured. In an action against the vendee at that sale, to cancel the notes and deed of trust on the ground they were obtained through fraud, *held* that neither the pledgee nor the vendee was an innocent holder or purchaser of the notes and deed of trust, and hence it is *held* that a decree cancelling them was proper.

4. **APPELLATE PRACTICE: Review: Matters not Presented Below.** An objection that the evidence does not respond to the issues or is not admissible under the petition cannot, under the statute, be raised for the first time on appeal.

5. **CANCELLATION OF INSTRUMENTS: Tender: Pleading.** In a suit in equity to cancel a note and deed of trust securing it, on the ground they were obtained through fraud, *held* that neither a tender before suit nor in the petition, of whatever may have been due from plaintiff, was necessary, since, first, plaintiff did not admit owing anything; second, even on defendant's theory that something was due, the amount was a matter of conjecture and dispute; and, third, the suit being in equity, an averment that plaintiff would comply with all orders and decrees of the court and would pay such amounts as the court might order, was sufficient.

Appeal from St. Louis City Circuit Court.—*Hon. Daniel D. Fisher,* Judge.

AFFIRMED.

*Henry H. Furth* for appellants.

(1) Defendant Gould was a bona fide holder for value. (a) An extension of time, even for a single day, is a valuable consideration. Loewen v. Forsee, 137 Mo. 29; Allen v. Harris, 79 Mo. App. 490; Deere v. Marsden, 88 Mo. 512; Smith v. Norman, 19 Ohio St. 148; Powers v. Woolfolk, 111 S. W. 1187. (b) Security for a debt given after the debt was contracted but in pursuance of a prior or contemporaneous agreement constitutes the receiver a holder for value. Miller v. Boykin, 70 Ala. 469; Boykin v. Bank, 72 Ala. 263; Marks v. Bank, 79 Ala. 558; Thompson v. Maddux,

117 Ala. 468; Jordan v. Thompson, *Ibid.* On a sale on credit to be secured by notes as collateral, the receipt of the collateral after the delivery of the goods makes the seller a bona fide holder of the notes, although the notes in question were not specified or described at the time of the sale, and were not, in fact, then in possession of the buyer. Fenby & Johnson v. Pritchard, 2 Sandf. (N. Y.) 151. (c) One who takes a negotiable note as security for a pre-existing debt is a holder for value under the Negotiable Instruments Law, and so is a lienor to the extent of his lien. R. S. 1909, secs. 9996, 9998; Payne v. Zell, 98 Va. 294; Wilkins v. Usher, 97 S. W. 37; Brooks v. Sullivan, 129 N. C. 190; Musick v. Alderman, 77 Conn. 634; Petrie v. Miller, 67 N. Y. Supp. 1042, 173 N. Y. 596; Brown v. James, 114 N. W. 591; Brewster v. Shrader, 26 Misc. (N. Y.) 480, 57 N. Y. Supp. 606; Lowell v. Bickford, 88 N. E. (Mass.) 1; Graham v. Smith, 118 N. W. 726 (d) Value is any consideration sufficient to support a simple contract. R. S. 1909, sec. 9996; Bank v. Tottenham (1894), 2 Q. B. 717; Bank v. Gordon, App. Cas. 240; Bank v. Silke 2 Q. B. 435; Banking Co. v. Bank, 21 Q. B. 535. (e) The rule that the transferee of negotiable paper is not an innocent holder, if there are circumstances connected with the transfer sufficient to put an ordinarily prudent man on inquiry is uncertain and devoid of uniformity, and will not be followed in this State. Hamilton v. Marks, 63 Mo. 167; Edwards v. Thomas, 66 Mo. 468; Bank v. Stanley, 46 Mo. App. 440; Bank v. Schoen, 56 Mo. App. 160; Leavitt v. Taylor, 163 Mo. 158. (f) The title of a purchaser of negotiable paper before maturity cannot be defeated by proof of a want of due care on his part. Nothing less than fraud is necessary to defeat his title. Bank v. Stoneware Co., 4 Mo. App. 276; Bank v. Pipkin, 66 Mo. App. 592; Cloud v. Book & News Co., 23 Mo. App. 319; Investment Co. v. Vette, 142 Mo. 560; Kuch v. Cornett, 79 Mo. App. 574; Investment Co. v. Filling-

ham, 85 Mo. 534; Wilson v. Ridler, 92 Mo. App. 335; Bank v. Hammond, 104 Mo. App. 403; Bank v. Salmon, 117 Mo. App. 506; Bank v. Bank, 109 Mo. App. 665; Bank v. Leeper, 121 Mo. App. 618; Jennings v. Todd, 118 Mo. 296; Mayes v. Robinson, 93 Mo. 114. (g) The doctrine of innocent holder applies to one taking a note as collateral security for a loan. Bank v. Eubanks, 124 Mo. App. 499; Stewart v. Givens, 128 Mo. App. 389. (2) The signatures to the note being genuine, and the note knowingly signed, defendant Gould was not bound to make any inquiries before taking the note. There was no evidence of either fraud or bad faith on his part. Briggs v. Ewart, 51 Mo. 245. (3) Appellant Haas made all the inquiries that a reasonably prudent man was bound to make before purchasing at the sale. He pursued the title to his vendor Gould. (4) Respondents, by remaining passive for nine months after acquiring full and complete knowledge that defendant Dausman had pledged their papers to defendant Gould, ratified defendant Dausman's unauthorized act and are estopped by their laches.

*Joseph A. Wright* for respondents.

(1) Upon the testimony of the payee in the collateral note, he had full knowledge of everything at the time he accepted the $515 note. Gould having had full knowledge of the facts, the appellant Max Haas could claim no greater right than his assignor could assert. Vette v. Sacher, 114 Mo. App. 363; Bank v. Ornsdorff, 126 Mo. App. 654. (2) Entirely apart, however, from any knowledge which Dausman may have imparted to him, Gould cannot be held to be an innocent purchaser for value. He purchased from George Dausman, the trustee in the deed of trust, under the circumstances aforesaid, and became chargeable with knowledge of the facts. Bank v. Furniture Co., 57 W. Va. 625, 70 L. R. A. 312.

STATEMENT.—On or about the 25th of April, 1905, plaintiffs below, one of them the respondent here, being the owners of a one-story house situated at 2614 Glasgow avenue in the city of St. Louis, executed a deed of trust to one George Dausman, as trustee, purporting to secure a principal note for $1500 as well as semi-annual interest notes for $45 each, the principal note due in three years after its date, the notes payable to one Henry J. Grimm. At the time of the transaction and for some time prior thereto, Dausman had been engaged in the real estate business at St. Louis, and plaintiffs, desirous of adding one or more stories to their building, and not having the money with which to do it, went to Dausman to raise the necessary money on the property. Dausman appears to have examined the property and told them that the proposed improvements would cost between two thousand and twenty-one hundred dollars, and that he could raise that amount for them on the property. For some reason not disclosed, however, it was concluded to borrow $1500 on the property as a first loan, Dausman testifying that he intended to raise the other, when necessary, by a second deed of trust. Thereupon he agreed with them to raise $1500 for the proposed improvements by means of a deed of trust on the property, and had this deed of trust and the notes drawn up, went out to the residence of plaintiffs with a notary public, and had them sign and acknowledge the deed of trust and sign the notes and they were all delivered to him. He thereupon placed the deed of trust on record and had Grimm, who at times did clerical work in his office, indorse the notes "without recourse." Grimm never paid anything for them, had no interest whatever in the matter and is designated in the testimony of the several witnesses as a "straw man." This all occurred in April, 1905.

One of the plaintiffs testified that Dausman told them at the time of the execution of the deed of trust

and of the notes that the money to be raised on the deed of trust could not be used for any other purpose than for the rebuilding of the house, converting it from a one-story into a two-story structure. Dausman neither furnished nor raised any money on these notes for that purpose nor did he make any arrangements for carrying on the proposed improvements, although repeatedly requested to go on by plaintiffs, until the summer of 1909, when he appears to have contracted with two men named Smith and Giesecke to remodel the house. As the evidence tends to show, their contract price was from two thousand to twenty-one hundred dollars. Smith and Giesecke began the work and when it was practically completed employed an attorney, former Judge Jesse A. McDonald, to file a lien on the property and commence proceedings for its enforcement, as none of the work done or material furnished by them had been paid for. They informed Judge McDonald that there was a deed of trust on the property, and on the suggestion that one Barney Schwartz, an attorney at law of St. Louis, held the deed of trust for collection or held it for some client of his, Judge McDonald called on Mr. Schwartz about the 1st of December, 1909, and told him that he represented Mrs. Veney, the owner, as also the contractors, and wanted to examine the deed of trust and the notes. Mr. Schwartz told Judge McDonald that they belonged to a man by the name of Gould but that he (Schwartz) did not at that time have possession of them but would have them later. Judge McDonald asked him when he could see them and Mr. Schwartz told him he could do so in a short time. About two weeks afterwards, Judge McDonald went back to Mr. Schwartz's office and the latter showed him the papers, the notes and deed of trust, including among the papers, a note of date September 14, 1907, signed by George Dausman, wherein he promised, one day after date, to pay to the order of J. S. Gould $515, with interest from date at

six per cent per annum.  The note, after the above reads:

"Payable at the office of Geo. Dausman Real Estate Co.

This note is secured by deed of trust., Geo. Dausman.

On property ~~4116 Nth. Taylor Av.~~

2614 Glasgow Ave."

A payment of interest, $30.90, of date September 15, 1908, was indorsed on this note. After examining the papers and making a memorandum of them, Judge McDonald, as he testified, told Mr. Schwartz that the transaction seemed a suspicious one to him; that the owner of the property had gotten no benefit from the deed of trust; that it would have to be contested.  Mr. Schwartz appears to have taken umbrage at this and the interview ended.  Mr. Schwartz testifies substantially as does Judge McDonald as to the call on him, and testified that after he showed Judge McDonald the deed of trust and the notes, Judge McDonald said: "This whole thing is a fraud."  Whereupon Mr. Schwartz remarked: "We will not discuss this thing further, Judge."  That, according to Mr. Schwartz, was the end of their interview.

It appears that about the time Mr. Gould had placed the Dausman note and the deed of trust and notes of plaintiff in the hands of Mr. Schwartz, that Dausman was confined in jail in St. Louis, and that Schwartz and Gould went up to the Four Courts and saw Dausman and spoke to him concerning his own note and the deed of trust; that Dausman told him he was going to pay Gould.  Mr. Schwartz told him that he would write to Mrs. Veney to see what condition the matter was in, because he (Schwartz) was worried at the time, as Dausman was then in jail under what he (Schwartz) considered a similar matter, as he testified, and he wanted to see how his client, Gould, stood with regard to the deed of trust. He thereupon wrote to the

plaintiffs, who were sisters and living together on the property, to the effect that he represented the holder of the deed of trust on their property and asked them to call at his office at their earliest convenience, the letter concluding: "It is necessary to your interest and the interest of my client that you call immediately." This letter from Mr. Schwartz to plaintiffs was the first the latter heard of the deed of trust being in the hands of anyone other than Dausman. Mrs. Veney appears to have called on Mr. Schwartz a few days later and told him of the transaction between herself and sister and Dausman; told him she "didn't know how they owed that money;" that Dausman had always said he was going to give them a statement but had never done so. Whereupon Schwartz undertook to get one from Dausman; met him in the hall of the office building in which he and Schwartz had their offices and told him to give Mrs. Veney the statement he had promised. Dausman, apparently sometime after April 20, 1909, delivered to Schwartz for the plaintiffs a statement of account, of date March 26, 1909, wherein he claimed to have expended $37.05 for "repair on roof" and "improvement of Montgomery street," and $252.21 for filing papers, advertising, court costs, sheriff's bill, "R. Deed" and "attorney," a total of $289.36, on which he gave a credit of $33.20 for "cash paid for costs."

Mrs. Veney testified that she had never authorized Dausman to employ an attorney for her and had never heard of these items until she saw them in this statement and knew nothing about them. About a month after Judge McDonald had called on Mr. Schwartz, Mr. Joseph A. Wright called on him concerning the transaction, acting as he told Mr. Schwartz, as representative and attorney for the plaintiffs. Some while after this, when does not clearly appear, Mr. Schwartz inserted an advertisement in an evening paper published in St. Louis, that the collateral to this note of Mr.

Gould's would be sold at the court house in the city of St. Louis, ten days after the date of the notice. How often this was published is not in evidence. Mr. Schwartz testified that he handed Dausman a copy of the advertisement cut from the paper and that he had mailed a copy to Mrs. Veney through the United States mail in a stamped envelope. Mrs. Veney and Mr. Dausman denied ever having received any such notice, and Dausman testified that he had never seen the notice and never heard of the sale until it was over, although his office was on the floor immediately above that of Mr. Scharwtz and they had had more or less business dealings with each other.

Mr. Schwartz admitted that although he knew before the sale that Judge McDonald was representing the contractors and had, on the first occasion of their interview, told him he represented plaintiffs, and knew that Mr. Wright represented them, further admitted that he had never notified either of them or these plaintiffs of the intended sale of the collateral to the Gould note. At this sale Max Haas, one of the defendants, purchased the collateral to the Gould note, that is, the deed of trust, the principal and interest notes, for about $580.50, that being a little over the amount of the Gould note, its accrued interest and the cost of advertising and sale. Prior to this sale it appears, according to the testimony of Mr. Schwartz, Mr. Haas came to the office of Mr. Schwartz and asked him about what the property was worth, and concerning the transaction, particularly whether the paper, meaning the principal note, had been "handled" before maturity, which Mr. Schwartz assured him was the fact. He also asked concerning Gould and who he was, all of which Mr. Schwartz informed him. He further asked Mr. Schwartz at that time whether he had sent notices to those several parties of the intended sale of the collateral to the Gould notes, that is the deed of trust and the notes of plaintiffs, and Mr. Schwartz told him

he had, and Mr. Haas asked to look at the deed of trust and notes. Mr. Schwartz was asked if he had told Haas that the notes and deed of trust had been pledged by Dausman without authority of plaintiffs. He answered that he did not know as to that, because he had had a conversation with Mrs. Veney before that in which they tried to square up the differences between Mrs. Veney and Dausman regarding the $256.-06 represented in the statement before referred to. Admitting that he had talked with Mrs. Veney and with Judge McDonald and with Mr. Wright prior to the sale about the matter, he was asked: "Were you not satisfied at that time that Dausman had pledged this note and deed of trust without any authority from the plaintiffs?" He answered: "Well, that would be more or less a conclusion." He was asked if he had not told Haas anything about that. He answered that he did not think he went into that feature of it; did not recollect that he did. We will set out Mr. Haas's version of this conversation later.

Mr. Schwartz testified that his connection with the matter ended with the sale of the collateral to Haas. Asked by the court whether, when Haas asked him if the $1500 note had passed to Gould before maturity, and he told him it had, whether he did not then know that plaintiffs and Judge McDonald, representing the contractors and builders, were questioning the transfer of the note and claiming it as a fraud, he answered that he knew that. Asked by the court why he did not tell Haas that, he answered that he did not think that was material; "I didn't want to spoil the sale of the note." By the Court: "You didn't want him to buy a note he couldn't collect? A. I believed he could collect it. Q. When he was asking you for information why didn't you give him all the information you could? A. When he asked me whether I believed this transaction was square, so far as Gould was concerned, I told him positively, yes, sir. Q. He asked you whether

it was square? A. Yes, sir. Q. You told him, so far as Gould was concerned, it was? A. Yes, sir. Q. Did you tell him, so far as Dausman was concerned, it wasn't? A. I intimated it. Q. That you knew the thing was in question? A. I won't say that. Q. You say you intimated it? A. Perhaps. Q. What did you say? A. I don't recall that. Q. How did he get the exact amount due on this note? Why did he bid that amount? A. I believe I announced before the sale that the property would have to bring at least so much money. Q. And he paid just that amount? A. No, sir; I think he paid slightly over that. Q. You had told him the deal was a square one so far as Gould was concerned? A. Yes, sir. Q. How did he come to ask you that question? A. I presume because of the difference in the amount. Q. Did he ask you whether it was bona fide? A. I believe he did. I told him Miss Veney had been up to my office, in fact, had been there several times, and I had asked her whether she had executed that paper, and all those facts, and she acknowledged to me she had, and then I knew if Gould was an innocent purchaser for value before maturity, I concluded the transaction, so far as Haas was concerned, was proper. Q. If Gould knew at the time he took the note that the note was the note of the plaintiffs put in Mr. Dausman's hands to be negotiated to raise money to pay on the property, and he only got $500 on it, or he only advanced $515, you knew that? A. Yes, sir. Q. And did Haas know that? A. I presume he could have seen that. I don't recall that feature of the transaction, although I should say perhaps he did; I suppose he saw it, as a business man. Q. You explained that? A. Yes, sir; possibly; he is a business man.''

Beyond acting as trustee in advertising the sale under the deed of trust, as attorney for Mr. Haas, Mr. Furth does not appear to have had any connection whatever with the transaction.

Returning now to the transaction by which Mr. Gould came into it, according to the testimony of Dausman, this deed of trust and the notes of plaintiffs were in his possession for nearly three years and soon after the execution of the deed of trust, he says he found, on getting the title examined, that plaintiffs did not have a clear title, and all proceedings for the negotiation of the notes were stopped for the time, Dausman in the meantime keeping the deed of trust and notes in his possession. (Beyond this statement of Dausman, there is not a particle of evidence that there was any flaw in plaintiffs' title. The inferences are all the other way.) It appears further by his testimony that until Dausman heard that Schwartz had written a letter to the plaintiffs, no demand had ever been made on them for the payment of their notes and deed of trust, and when Dausman contracted with Smith and Giesecke to rebuild their house, he had not told them anything about this deed of trust being pledged to Gould, although he knew that these contractors had never been paid anything on account of their work about the house.

Dausman and Gould had been acquainted several years prior to 1907, Dausman having acted for him in making a loan on some property in Kirkwood, the loan amounting to $500. That loan had been made about three years prior to the 14th of September, 1907. The Kirkwood loan was paid off early in that month, Dausman having collected it some little time before this 14th of September, how long before that is left entirely in the dark, neither Dausman nor Gould fixing the date. At all events, after its collection Gould appears to have called on Dausman about the matter and Dausman told him (Gould) that he (Dausman) could use the money in another place, and proposed to give his personal note to Gould for the amount, $515, and to put

up this deed of trust and the notes of plaintiffs as collateral for the payment of his own note.

Dausman testified that he could not remember the conversation that took place between him and Gould at the time but that he thought Gould asked him if this collateral was good enough for the amount, that is for the $515. Dausman told him he thought it was. He handed Gould the deed of trust and the notes of plaintiffs; did not know whether Gould read them or not; did not think Gould asked him how it happened that he (Dausman) was named as trustee in the deed of trust and still held the notes; did not ask who Grimm was, although Dausman testified that Gould did not know Grimm personally; did not ask Dausman any questions about how those notes happened to be payable at his (Dausman's) office. Asked how he (Dausman) happened to give Gould a one day note, he answered: "Because it was an indefinite time." "It was an indefinite time," said Dausman, because he did not know how long he wanted it and just made it one day after date without specifying any time. When Gould came down to get this individual note of Dausman's it was signed up. They had talked about the matter before that so that it was all signed up when Gould came in the day upon which it was delivered to him. Dausman, called as a witness by the plaintiffs, gave the above testimony in his direct examination.

While under cross-examination by counsel for one or more of the defendants, Dausman was asked by the court whether, when he passed these notes of the plaintiffs and the deed of trust to Gould, he (Dausman) was indebted to him in the amount of his note to him. He said that he was. The court asked him if he had borrowed the money from him at that time. He said, "Yes." The court asked him if the pledge by him to Gould at that time was to secure the debt "that you then owed him?" Dausman answered: "It was a payment he got." That he gave Gould the note for the

$515, and that was the money that came to him (Gould) from a loan in Kirkwood, which he (Dausman) had collected and which was due Gould, and that instead of giving Gould the money he (Dausman) gave him this $515 note and gave him the notes and deed of trust of the plaintiffs to secure the payment of that note; that Gould asked him if that security was good and he said it was. That Gould did not ask him whether he (Dausman) owned those notes or not; that Dausman had not told him whether he owned them or not; that he had not asked him and that nothing was said about it. The court asked him what assurance Gould had that he (Dausman) owned the notes. Dausman answered that he did not know. The court said: "He didn't ask for any," to which Dausman answered, "No, sir." The court asked him if he had given Gould any explanation as to how he came in possession of those notes. He answered, "No;" that nothing was said about it; that he had not told Gould that he had himself loaned this money to these people and Gould had not asked that. The court asked him if, generally, he explained such matters to people and told them whether notes belonged to him or not. He answered that if they asked him the question he did, or he would say: "We have such and such a paper here, and we give you this. They hardly ever ask if we own them or not;" that in this case Gould had not asked anything of the kind.

His cross-examination resumed by counsel for defendants, Dausman stated that these notes of the plaintiffs were indorsed in blank. Asked whether they were due at the time or had matured, he said: "No, sir; I don't know; I don't think they had;" that they had some few months to run. Asked if at the time Gould had left the Kirkwood deed of trust to be collected, whether anything had been said about his using the money himself, he answered, "No," but that after this Kirkwood loan had been paid he told Gould that

he could use that money elsewhere. Gould asked him whether the property was worth the money, and Dausman told him he thought it was. The court then asked him if prior to the time he gave these notes as collateral security to Gould, Gould had authorized him to make use of the money himself. He answered that he had not done so before that time. The court then asked him this: "He was there to get his money and you gave him this note instead of the money? You gave him your own note secured by those notes instead of giving him the money? A. I told him I could give him these collaterals for the amount of the loan." The Court: "He came to you to get the money you had collected from the Kirkwood loan? A. Yes, sir." The Court: "You didn't have it to give to him? A. No, sir." The Court: "And instead you gave him your note and these notes as collateral security to secure the payment of that note due in one day A. I think I did have the money at that time; it was only a few days after I got it." Asked by counsel for defendants if he was ready to pay the money at that time he answered: "Yes," but that he had told Gould he could use the money elsewhere; could place it elsewhere, and he gave him his own note and this deed of trust and notes as collateral security.

On re-examination Dausman was asked why he gave his personal note and he answered that he did not know. Asked if he could bring into court a bank book showing that he had $500 or anything like that sum on deposit on the 14th of September, 1907, he answered that he did not think he could; that he might have had more than that; that he could not produce any bank book now because he could not tell what bank he was doing business with at the time but knew he did not have the $515 in his pocket. Asked to produce his bank book and show it, he answered that he would have to find out what bank he was doing business with at the time, whereupon the court asked the witness,

that if this money belonged to Mr. Gould, money he owed Mr. Gould, which he had collected on the Kirkwood loan, was left with him by Gould to be loaned out again, as the witness had said he told him he would place it again, why Dausman gave his individual note to Gould for it. This witness answered: "It may have been I said that I could use it myself; I may have told him that."

Mr. Gould's account of the transaction is about as follows: He was conductor on a passenger train on a railroad and had been for twenty-three years past; had been acquainted with Dausman for a number of years prior to this transaction; became acquainted with him sometime about 1905; saw an advertisement by Dausman in the paper for money to loan, five or six hundred dollars, or something like that; that he wanted to get to loan out; went to Dausman and loaned through him $500, secured by deed of trust on some Kirkwood property; that was a three-year loan, which fell due along about September 1, 1907; had been loaned then about three years. The loan was payable at Dausman's office and Dausman received payment of it and notified Gould of that fact. Asked how Dausman happened to execute this $515 note, payable one day after date, witness said he did not know that he could explain it, except that it is usual and customary for a man to give a note for money loaned. When he went in to see Dausman about the money after it had been collected, Dausman told him he had the money and could place it for him if he (Gould) did not need it; that he could place it for him on another loan, whereupon Gould told him to place it. Dausman then executed the note before referred to for $515, Gould, as he testified, understanding at the time, that Dausman was going to use it for the improvement of the property on Glasgow avenue, described in the deed of trust; that was his understanding when he accepted Dausman's note and the note for $1500 and the deed

of trust made by plaintiffs. Asked if he had testified
to anything like that before a commissioner when his
testimony had previously been taken he said he did
not know and did not remember now but that "it
seemed like that was his understanding" when Daus-
man gave him his personal note and the note for $1500
and the deed of trust. The court asked him if he knew
that Dausman held that note for these plaintiffs. He
answered that he did and that he had given him plain-
tiffs'. note and the deed of trust as collateral to his
(Gould's) own note, telling Gould that he (Dausman)
wanted money "for the colored women to repair their
house." The court asked him if he knew that Daus-
man was getting money on their note for that pur-
pose. Witness answered, "Yes, sir; he gave me the
note for $1500 and the deed of trust as security."
Counsel for plaintiffs asked him if Dausman had told
him for whom he was raising money to improve the
house. Witness answered that he thought he did. He
was asked if he knew Dausman had not paid him the
$515. He answered that he did, but Dausman was go-
ing to apply that $515 which he (Gould) was to loan
him to the repairs of the house; that was his under-
standing from Dausman. At that time Duncan had in
his possession this $515 "to make a loan for me,"
said Gould. Thereupon this occurred in the examina-
tion of the witness: "Q. What he was really doing
was paying you off, wasn't he? A. Paying me off?
Q. Yes, sir; by giving a one day note? A. That I
can't say. Q. What? A. That I can't say. Q. You
didn't advance any money? A. No, sir; he had the
money in his possession and gave me a note for $1500
signed by Miss Veney and Taylor, and the deed of
trust as security."

Asked if when Dausman's note was handed to him
the number "4116 North Taylor avenue," had a line
through it and 2614 Glasgow avenue inserted in its
place, witness answered that it was in that condition

when the note was handed to him and that the altera-
tion had not exicted his suspicion; that he had a deed
of trust for some property on Kossuth avenue, west of
Taylor, but not on Taylor; that he bought that from
Dausman and had turned over the collection of that
along with the collection of the Dausman note and the
$1500 note of plaintiffs to Mr. Schwartz as his attor-
ney. The note on the Kossuth avenue house was for
$1200. He had gone to Mr. Schwartz with the papers
because Mr. Dausman had referred him to Mr.
Schwartz. When witness heard that Dausman was in
trouble and in jail he had gone down to the jail with
Mr. Schwartz to see Dausman about his (Gould's) mat-
ters. Asked if he could give the entire conversation
between himself and Dausman at the time he took the
note and deed of trust as collateral, he said that as
near as he could remember Dausman gave him the note
and paper, deed of trust, and he asked Dausman if it
was absolutely safe and Dausman said it was. "That,"
said witness, "is about all that happened," except that
he said "he wanted to use the money for improving
this Glasgow avenue property;" that he had not said
anything to him about wanting to have it for his per-
sonal use. Witness testified that he would not have
loaned it to Dausman or to anybody else on a personal
note and while he was giving his personal note, wit-
ness understood it was to be secured by the deed of
trust and the $1500 note. The collateral was sold at
the east front door of the court house in the city of
St. Louis, on the 15th of February. Witness attended
the sale; had not notified the plaintiffs or Judge Mc-
Donald or the contractors, who were filing a lien on
the property, of the sale. None of these parties were
present on the 15th of February when the collateral
was sold, as far as he knew; Mr. Schwartz was look-
ing after the business for witness. After Dausman
had given him the $515 note, of date 14th of September,
1907, and it was not paid, he (witness) commenced

going to Dausman for it and dunning him for it and telling him he needed the money and Dausman put him off from time to time; had gone up to see these plaintiffs one evening about owning and holding their note and deed of trust but could not tell whether that was before or after Mr. Schwartz had written to them about it; it was something like a year prior to the date of the trial, which was the 10th of October, 1910.

On cross-examination witness stated that Dausman was the only man through whom he had loaned money; that when he called on Dausman, his understanding was that the Kirkwood loan had been paid and that Dausman had the money from the collection. It was perhaps a little while before that that Dausman had asked him for the loan of this money. Nothing was said at that time about the note or the security Dausman was to give, or whether he was to give any security for it—witness did not think there was. When he went down to Dausman's to collect this Kirkwood money, Dausman did not offer to pay it to him, made him no offer. He said he could turn the money for him or place it for him if he (Gould) did not particularly need it, and that Gould had allowed him to do, as he did not need it. When Dausman gave him his personal note for the $515, there was nothing to excite his suspicion about it. What he wanted was the loan secured and he took Dausman's note because it was secured by the deed of trust and the note. It made no difference to witness whose note it was as long as it was secured.

On re-examination by counsel for plaintiffs, this witness, Gould, admitted that when his testimony was taken before a commissioner, he had stated that after the Kirkwood loan was paid off he had a talk with Dausman, and Dausman had asked him if he (Dausman) could use the money, and that he had then answered, "Yes," and he now said that answer was correct; that they had spoken about Dausman using the

money at different times when witness was down at his office and that Dausman had told him several times that if he (witness) did not need it when it was paid he could place it for him. He also admitted that in the testimony he gave before the commissioner, when asked what he had told Dausman when Dausman had asked him if he could use the money, he had answered, "Of course he could use it if he could furnish collateral;" that he had the money to loan and wanted to make out of it all he could. Dausman said he could use it and would fix up a note and handed him the papers. The papers were all made out when he went to Dausman finally and Dausman handed them to him for the money he had collected. That might have been a week or two weeks and might not have been more than a day or so after Dausman first told him about collecting the money. Asked why he had not said anything in his testimony before the commissioner about Dausman telling him he was going to use that money for a building loan, he answered: "The question perhaps wasn't put to me." Asked if he had testified that Dausman said he wanted the money for his personal use, he answered that he did not think that he had; that he would not have loaned it to him for his personal use. Asked by Mr. Furth, "When you say there that Dausman said that he could use the money, that doesn't mean that he was going to use it personally? A. No, sir; I wouldn't take it that way; I took it for granted that he would place it for me and furnish me collateral. . . . That was the understanding, that he was going to use it and place it as a loan and furnish me collateral. I didn't understand him that he was going to use it for his personal use."

Recalled for examination by the defendants, Mr. Gould was asked to state what the transaction was when these notes were pledged to him by Dausman, as nearly as he could remember to state what hap-

pened. He answered: "I understood that to be a straight, honest and bona fide transaction." The Court: "Which? A. When Dausman delivered me the $515 note and the $1500 note and deed of trust. Q. You understood what? A. I understood it to be an honest and honorable transaction; the $1500 note and deed of trust was to secure me on the $515 note. I took that to be an honest and honorable transaction on the part of Mr. Dausman." By Mr. Furth: "What did Mr. Dausman say to you and what did you say to Mr. Dausman on the occasion when that pledge of those notes was made? A. He gave me those papers to secure me. Q. Yes, sir; what did he say to you? A. He said: 'These are absolute security for this note of $515.' Q. Did you look at those notes and that paper at the time? A. Yes, sir. Q. Were these notes (indicating) in that condition at that time? Turn them over and look at them. Have they been altered in any way? A. Not as I know of. Those were signed by Henry J. Grimm, without recourse; I don't know about his (indicating), but that (indicating) was on there. (What is refered to is not clear by the record). Q. They were indorsed in blank at that time? A. Yes, sir. Q. Were they due at that time, do you know? A. I can't say. Q. According to the dates they matured April 26, 1908, and you got them September 14, 1907, didn't you? A. Yes, sir. Q. Now, what information, if any, did you have about the transaction between Mr. Dausman and Mrs. Veney and Mrs. Taylor, what knowledge or information? A. I don't know that he gave me any information about them. Q. Did you ask him anything about them? A. No, sir, I didn't; I didn't ask him anything about them at all. He simply said that their paper secured me. Q. You had this $515 coming from him? A. Yes, sir. Q. And took this as security for your debt? A. Yes, sir; took the $1500 note and the deed of trust as security."

Mr. Gould further testified that after receiving the note from Dausman, Dausman had paid the $30.90 to him which was indorsed on the back of the note and that because he had paid that year's interest he had not pushed him for collection for the year following; that after that year was out he began to crowd him for the money and Dausman kept putting him off from time to time. He was asked by the court if he had asked Dausman if he owned that $1500 note or not. He answered, "No, sir; I didn't; I didn't ask him if he owned it;" that he took it for granted that the transaction was absolutely honorable and square.

So much for Mr. Gould's account of the transaction.

Mr. Haas testified that he had purchased the deed of trust and the principal and interest notes at the sale on February 15, 1910; that before the sale he had inquired whether the note had been pledged before maturity; also inquired whether there was a chance of their being forged. Mr. Schwartz assured him that there was no forgery. Witness asked him what was wrong with the paper and Schwartz said there was something in a deed from the grantor to these grantees, Veney and Taylor, and there was another party. Witness then looked at the deed as recorded at the City Hall, consulted his attorney, and found, in his own opinion at least, that plaintiffs had a perfect title and concluded that the deed of trust, that is the security for the $1500 note, was perfect, and on that conclusion went to the sale and bid when the deed of trust and notes were put up and purchased them. Asked if he had inquired whether Gould had given any value for his pledge he answered, "I made every inquiry necessary to assure myself that the transaction was in every way bona fide." The Court: "That is not an answer." By Mr. Furth: "Did you inquire whether Gould had given any value for his pledge? A. I did. Q. What information did you have on that subject?

A. I was shown the note which Gould had. Q. As to what value he gave for the pledge? A. Five hundred and fifteen dollars, I understood. Q. Who told you that? A. Schwartz. Q. Was that before the sale?'' Witness' answered that it was. He further testified that neither plaintiffs nor any one for them had ever tendered him any money for the surrender of these papers before the beginning of the suit.

On cross-examination he testified that he was a dealer in real estate mortgages and in real estate; dealt a good deal in "seconds" and "firsts;" had been in the business since 1902; did not do much real estate business, apart from purchasing deeds of trust. Witness's office is on the second floor below that of Mr. Schwartz and he went into the latter's office to inquire about this. deed of trust; had simply asked Mr. Schwartz about the validity of the transaction, whether the transaction was all right as between Gould and Dausman, whether the deed of trust was a forgery or whether it was a bona fide deed of trust, and Mr. Schwartz had given him a satisfactory answer in both instances; that he asked Mr. Schwartz about the title and Mr. Schwartz referred him to a title examiner, whom he saw, and concluded that the title was good in these plaintiffs. Asked if he did not know at the time that Dausman had been in jail for some such similar offense, he answered that he did not know there was any offense connected with this transaction; that if he had known it he would not have touched it; that he knew Mr. Dausman had been arrested. Asked if he did not know that he had been arrested for taking money from people on deeds of trust, he said: "I don't know about that." Counsel for defendants objected to this line of questioning, arguing that if Dausman was in jail for taking somebody's money, it did not follow that three years before he had done the same thing. To which the court replied: "No, sir. He says he started to find out and inquired whether this was a bona fide note. Now, then,

what he inquired is one thing and what he knew may go in to show whether he availed himself of all the sources he had of ascertaining. I think that may go in.'' This was objected to by counsel for the defendants and exceptions saved, no ground of objection, however, being stated. He was then asked if he did not know that Dausman had been arrested on the charge of appropriating the money of his customers before that. This was objected to, no ground stated, objection overruled and exception saved. Witness answered: ''You asked if I knew he had been arrested?'' Counsel: Q. ''Yes, sir. A. I knew Dausman had been arrested; I think it was before that time.'' Asked if he had looked at the $515 note before the sale, he said he thought he had. Asked if he had noted the erasure on it by scratching out 4116 North Taylor and writing 2614 Glasgow under it, he said he may have noticed it but that it did not excite his suspicion; had noticed that it was a one day note; noticed that Dausman was the trustee in the deed of trust but that would not have made any difference to him; noticed that the notes secured by the deed of trust were payable at Dausman's office but that did not ''hurt the note any;'' had noticed all that before the sale; had looked at the property before the sale

Witness testified that he was familiar with the fair market value of real estate in St. Louis and was of the opinion that on the 15th of February, 1910, the date on which he purchased the collateral, it was reasonably worth between twenty-seven hundred and fifty and three thousand dollars, that is, in the shape it was at the time he saw it, and provided everything was paid, with no debts against the property and assuming the title was perfect.

This is substantially the testimony in the case.

At its conclusion the trial court found for plaintiffs and entered up a decree directing the cancellation of the deed of trust and of the note securing it. From

this the defendants Haas and Furth, as trustee, interposing a motion for new trial and excepting to its overruling, duly perfected their apeal to this court. Pending the appeal here, the plaintiff Sarah Veney died and her death being suggested the cause proceeded, so far as respondent is concerned, under the provisions of section 2075, R. S. 1909, in the name of the surviving respondent, Laura Taylor.

REYNOLDS, P. J. (after stating the facts).—As this is a suit in equity we, an appellate court, as in duty bound, have gone over all the testimony in it, as abstracted by counsel for the appellants, and have set out the material parts of it. While in such a suit we are to weigh the testimony ourselves and determine the cause from our conclusions on that testimony, and are not bound by the finding on the evidence which has been made by the trial court, it is and always has been an established rule in all our appellate courts, to pay great deference to the conclusion arrived at by the trial judge on the facts. Obviously this is a correct rule of decision. He has before him the witnesses; he has heard what they have to say; has seen their manner in testifying, and that has everything to do in determining the credit to be given, for it is not always the spoken word that conveys the real truth. He has not only observed them but, as shown by the record in this case, has followed all of their testimony with great care. Not always satisfied with the testimony elicited from witnesses by counsel, but in an endeavor to arrive at the true facts in the case, the learned court in this case has questioned the witnesses himself. So that it is obvious that this case was tried with very great care by not only a learned but by one of the most experienced trial judges in the State. We have no hesitation whatever, therefore, in applying the rule which we have before stated to its determination, namely, to accept the conclusion on the testimony ar-

rived at by that court. With that conclusion before us, as evidenced by the decree which he ordered entered and in the impression made upon us by our own examination and consideration of the testimony, we see no reason to disturb the judgment of the trial court. That a gross fraud was attempted to be perpetrated upon these plaintiffs, is beyond question. The perpetrator of that attempted fraud in the first instance was George Dausman. But as usually happens in cases of this kind, Dausman could only succeed in perpetrating the fraud by the connivance and co-operation of others.   He had that here, through Gould and Haas.  Fraud is established and chargeable to parties if, with the means of acquiring knowledge, they shut their eyes to all the surrounding circumstances and, claiming that they did not know of the fraudulent acts, seek advantage to themselves through those acts. If courts of equity permitted this kind of a defense, they would surrender their great function of cutting through all devices and pretenses to prevent or overturn the fraud.

It is said that the defendant Gould is a man who is ignorant of ordinary business transactions. His testimony contradicts any such plea. He had been a conductor of a passenger train on one of the largest railroads of the country for many years, and it is not usual for men of simple minds and lacking in ordinary business knowledge and common sense to occupy such responsible positions long. As we read his testimony and as the trial court undoubtedly understood it, he had turned his money over to Dausman to loan on real estate in Kirkwood. That loan fell in, Dausman collected it and, while he notified his customer, Gould, that he had collected the money, he never offered to pay it over to Gould, but told him that he wanted to use the money himself. True that Gould says that Dausman told him he wanted to invest it again, but how? Not by reloaning, but by using it in

making repairs on a house and giving his own note for it and putting up as his collateral the note and deed of trust which he practically told Gould he did not own, for Gould swears that Dausman told him he was going to apply the $515 he had of Gould's money to improving the property of plaintiffs. Conclusive evidence was before Gould that nearly three years after the execution of the deed of trust, Dausman had not himself raised the money for the purposes for which that note and deed of trust were given. The very fact that Dausman then had the papers was so against all business ideas, that Gould should have been put on his guard. The truth seems to be that Dausman had converted this money of Gould's to his own use and did not have it available to turn over to his customer, and that Gould, realizing this, did the best he could to extricate himself from the unfortunate dilemma in which he was placed. The only thing he could do was to take what Dausman offered him. That was Dausman's own personal note secured by a pledge of the deed of trust and the notes which had been executed by these plaintiffs; and he took plaintiffs' deed of trust and notes "as collateral" to Dausman's own note, those notes then almost due, nearly three years old, and still in the hands of Dausman, the trustee, the improvements not made. Gould himself admits that he knew that this was a building loan; that the money was to be used for the improvement of the property; that Dausman told him that he wanted to put this $515 into "the improvement of this property." That was ample to have excited inquiry on the part of Gould as to whether the balance of the $1500 had gone into the improvement of the same property, and if not, where it was to come from. It certainly was sufficient to put Gould on inquiry as to whether Dausman, holding this note as a trustee for a specific purpose, had executed the trust up to that time, and was owner of the notes. We do not believe, reading all of the testi-

mony in the case, that Mr. Gould was an innocent pur-
chaser in this transaction to the extent of his acquisi-
tion of this deed of trust and of these notes, shielded
by the innocence that is necessary to give one that char-
acter in a court of equity. Nor is his conduct after he
had acquired this deed of trust and these notes as col-
lateral consistent with fair dealing. Not that he him-
self acted. But the attorney in whose hands he placed
those papers for collection, Mr. Barney Schwartz, did
act. Mr. Schwartz was informed by Judge McDonald
and by Mr. Wright that these plaintiffs had received
nothing on account of this deed of trust. He was in-
formed by Mrs. Veney that Dausman had never fur-
nished the money to make the improvements, nor ren-
dered an account of his expenditures in connection
with the improvement of the house. He knew that
these attorneys and these plaintiffs were challenging
the deed of trust and its notes. Without giving them
any chance to protect themselves and prevent inter-
vention of another, he advertised these notes and deed
of trust for sale and sold them to the defendant Haas.
Every step in this transaction then, as far as Gould
was connected with it personally or through his attor-
ney, from its inception to the time of the sale of the
collateral is surrounded with such facts and circum-
stances as inevitably leads us to the conclusion that
Gould knew of the infirmity of Dausman's title to the
deed of trust and of the notes which he purported
to convey to him as collateral for his own note and
as between Gould and these plantiffs it cannot stand
for a moment's inspection or the slightest scrutiny, and
that after acquiring them, through his attorney, Mr.
Schwartz, he endeavored to put them beyond the reach
of plaintiffs by a sale to a pretended innocent party
is clear.

When we come to the relation of the defendant
Haas to the matter, while there is not as much active

participation in the fraud attempted to be perpetrated on these plaintiffs as is shown in the acts of Gould and his attorney and Dausman, Mr. Haas is in the position of any other man who, with all the means before him of acquiring information, blindly closes his eyes and is satisfied to find out as little as possible in connection with the transaction in order that he may occupy the position of an innocent purchaser for value and without notice. One who has the opportunity to know and inform himself is bound to do so. When he fails to do so he cannot use his failure and his pretended lack of knowledge and of .information and of participation as a club with which to strike down innocent parties and as a means of depriving those parties of their property and of their just rights. He says he has been in the business of buying deeds of trust for several years. When he is offered this one for $1500, pledged for $515, evidenced by a one day note, all he asks is whether the $515 note is genuine and whether the title of the maker of the deed of trust is good. He makes no inquiry as to the $1500 note, nor as to the right of Dausman to pledge it for his own note. Shuts his eyes as to all that, although as a business man he surely knew that such a transaction was unusual. His claim of innocence is not borne out by the evidence of Mr. Schwartz, who said, in answer to a question by the court as to whether he had told Haas that so far as Dausman was concerned, that the transaction was not square, that he "intimated it." Mr. Schwartz and Mr. Haas occupied offices in the same building and seem to have been pretty well acquainted with each other for some time. Such an "intimation" should have been sufficient to a man of Mr. Haas's occupation and experience. In other words, all of these parties here, except Mr. Furth, who was a substituted trustee and against whom there is no evidence of any kind of lack of good faith in the transaction, cannot be permitted by a court of equity to hold on to this deed of trust

and the notes and to derive any advantage from the alleged purchase of them which a court of equity will acknowledge.

Counsel for appellants .claim that the petition is defective and fails to state a cause of action. We do not agree to this. Its facts may be defectively stated but it states a cause of action and a good one, of which a court of equity will take cognizance. All of the testimony was before the trial court and is before us. Not a suggestion was made during the progress of the trial that any of the testimony offered was out of line with the averments of the petition in the case. Not a suggestion was made that the testimony offered in the case was not responsive to the issues tendered and, as said over and over again by our courts, following the direction of our statutes, these objections come too late when made in an appellate court.

Counsel for appellants argue that it appears from respondents' evidence that Dausman, in performing his contract, expended $256 on behalf of respondents, in clearing the title to their property, and that he unquestionably has a lien on the notes in his possession and this interest was capable of being pledged and that Gould and his vendee, Haas, are undoubtedly entitled to this out of the note, regardless of the view the court may take of the claim for the whole of the $575. We are unable to satisfy ourselves on any view of the evidence that the $1500 note is subject to any of these claims. We have before us the account which Dausman rendered to respondents and are unable to identify, either from the account itself or by any evidence concerning it, any of the items in it as within the expenditures contemplated when the deed of trust and notes were executed.

It is further urged that respondents should have offered to pay what was due, if this is a bill to redeem. Conceding, however, that it is not a bill to redeem but a suit to cancel the deed of trust and notes, counsel

for appellant urges that before the suit was brought respondents should have either paid or offered to pay any sum due, and that failing to give appellants an opportunity to accept or decline, they had needlessly mulcted appellants in the costs and expenses of the action. If we correctly comprehend the position of counsel, it is that a tender before suit, or in the petition, an offer to pay whatever was due, should have been made. Neither is necessary. In the first place, respondents never admitted that they owed anything. In the second place, even on the theory of appellants, that something was due, the amount was entirely a matter of conjecture, certainly of dispute. In the third place, and conclusively against this claim, this is a suit in equity. In the petition, after praying for specific relief, plaintiffs pray for ''such other and further relief as may seem just and proper in the premises. Plaintiffs further aver and state that they will comply with all orders, judgments and decrees of the court and will pay such amounts, if any, as the court may order, adjudge and decree to be due the defendants or either of them.'' This meets all the requirements of the case—that is, it is an offer to do equity. Neither a tender or plea of prior tender was necessary. [Whelan v. Reilly et al., 61 Mo. 565, l. c. 570; Kline v. Vogel, 90 Mo. 239, 1 S. W. 733, 2 S. W. 408.] In that case, at page 250, Judge BLACK, speaking for a majority of the court, says: ''The petition shows a case where it is necessary to take an account of rents, taxes, repairs, etc., and contains an offer to pay whatever is due to Vogel. In such cases a tender before suit is not required, nor need the plaintiff bring any money into court until the amount due is ascertained.'' [See also Ailey v. Burnett, 134 Mo. 313, l. c. 320, 32 S. W. 1122, 35 S. W. 1137. and Carroll v. United Railways Co., 157 Mo. App. 247, l. c. 293, 137 S. W. 303, and cases there collated.]

We see nothing from the record in this case, look-

ing at the petition, looking at the pleadings, considering the testimony, to warrant us in disturbing the finding of the trial court. Its judgment enjoining the sale under the deed of trust, cancelling that deed of trust and the notes, should be and is affirmed. *Nortoni* and *Allen, JJ.*, concur.

